CASE 79.—ACTION BY MARY H. McCLURE'S EX'R 'AGAINST C. L. AND H. A. KING ON LAND NOTES INVOLVING PRIORITIES OF LIENS, SUBROGATION AND ESTOPPEL.—October 15.

## McClure's Exr. v. King, etc.

Appeal from Henderson Circuit Court.

J. W. Henson, Circuit Judge.

From the judgment plantiff appeals. Reversed.

1. Subrogation—Payment of Debt—Rights of Surety.—Plaintiff's testatrix and her husband sold certain land by title bond, taking several notes in payment of the price, with F. as surety. On the day after the notes were executed, F. paid testatrix the amount of the first two notes, which were thereupon assigned to him without recourse, and F. thereafter sold the notes to defendants. Nothing more was ever paid on the remaining notes, and testatrix sued to recover the amount thereof, and to subject the land to the payment of the judgment. Held, under the rule, that subrogation cannot be invoked until full satisfaction of the original creditor's debt, defendants were not subrogated to testatrix's rights as to the notes so assigned for the purpose of having them declared a

McClure's Ex'r v. King, etc.

prior lien on the land to the testatrix's remaining notes unpaid.

2. Estoppel—Representations.—Under the rule that, in order to work an estoppel, the representations relied on must be plain and positive, and such as would mislead a person of ordinary prudence, testatrix was not estopped to claim a prior lien on certain land for the payment of purchase-money notes, because her husband, acting as her agent, stated to defendants that the first two notes which had been paid by a surety thereon and assigned to him, and were about to be transferred to defendants, "were all right."

THOS. E. WARD, attorney for appellant.

## SUBJECT DISCUSSED.

1. Subrogation.

## AUTHORITIES CITED.

Brant on Suretyship and Guaranty (3d Ed.), section 333; Am. & Eng. Encyc. of Law, vol. 27, p. 211; Willingham v. O. V. Banking & Trust Co., 22 Ky. Law Rep., 158; Columbia F. & T. Co. v. Kentucky Union Ry. Co., 60 Fed. Rep., 794; Shields on Subrogation, section 127; Hollingsworth v. Floyd, 2 Har. & G., 91; Insurance Co. v. Dorsey, 3 Md. Ch., 334.

2. The creditor's right in the lien must be entirely divested before the surety can be subrogated by operation of law. Magee v. Leggett, 48 Miss., 139; Bank v. Benedict, 15 Conn., 437; Cannet v. Blodget, 39 N. H., 152; Harlan v. Sweeney, 1 Lee, 682; Gilliam v. Esselman, 5 Sneed, 86; Kyner v. Kyner, 6 Watts, 221.

ROBERT D. VANCE, attorney for appellees.

## PROPOSITIONS DISCUSSED.

Where appellee is induced by the appellant's representations or actions to purchase real estate notes under the belief that they are first liens upon real estate, the appellant is estopped from asserting that notes held by him are a prior lien upon said real estate.

AUTHORITIES CITED.

Wimmer v. Ficklin, 14 Bush, 193; 16 Cyc., 755; Dodge v. Pope, 93 Ind., 480; 16 Cyc., 770; Crawford v. Colyer, 12 Ky. Law Rep., 990; Doss v. Kinchloe, 36 Ky. Law Rep., 452; 16 Cyc., 770; 4 R., 843.

OPINION OF THE COURT BY COMMISSIONER WM. ROGERS CLAY—Reversing.

On February 10, 1898, Mrs. Mary H. McClure and H. D. McClure sold to F. H. Martin, by title bond which was not recorded, a certain piece of real estate in Corydon, Ky., for the sum of $489. For the purchase price F. H. Martin, as principal, and A. L. Frisbie, as surety, executed to Mrs. Mary H. McClure the following notes, dated February 10, 1898, and bearing 8 per cent. interest from date: One for $60 payable on or before September 1, 1898; one for $100, payable on or before January 1, 1899; one for $109.66, payable on or before January 1, 1899; one for $109.66, payable on or before January 1, 1900; and one for $109.66, payable on or before January 1, 1901. On the day after the papers were executed, A. L. Frisbie, the surety, paid to Mrs. McClure the sum of $160, the amount of the first two notes. These notes were assigned to Mr. Frisbie, without recourse; the indorsement being signed by Mary H. McClure by H. D. McClure. Subsequently Frisbie sold and assigned the two notes in question to appellees, C. L. and H. A. King. Nothing more was ever paid on any of the notes by either Martin or Frisbie, so on August 28, 1903, Mrs. McClure, who has since died, brought suit on the three notes in her possession, asking a personal judgment against Martin and Frisbie and that the property be sold to satisfy her

claim. On April 11, 1904, appellees, C. L. and H. A. King, filed their petition, which was made a cross-action, against Martin and Frisbie, in which they set forth the assignment of the two first notes to Frisbie, and their subsequent assignment to them under an agreement between all the parties to the contract that the first two notes should be a prior lien on the property, and prayed for judgment accordingly. To this petition and answer Mrs. McClure replied, setting up that Frisbie was the surety on the notes, and as such had paid them and taken an assignment thereof. She denied that Frisbie had any lien on the property superior or equal to plaintiff's lien, or that the Kings had any lien thereon except such as was subject to hers, and further denied that she or any one for her had ever made any agreement with the Kings or any one for them whereby their notes were to be paid first. Appellees thereupon filed their rejoinder, in which they alleged that prior to the purchase of the notes in question Frisbie and Martin represented to appellee H. A. King that the said notes were secured by first mortgage lien upon the real estate sold; that they further informed H. D. McClure, agent of plaintiff Mary H. McClure, of their desire to purchase said notes and of the representations made by Frisbie and Martin, and that said McClure said to appellees that the notes were all right, and to go ahead and trade for them; that in purchasing said notes they relied upon said representations. They then claimed that plaintiff by reason of said representations was estopped from asserting the suretyship of Frisbie, and from controverting the priority of appellees' lien. Upon the hearing the trial court entered a judgment placing all the notes upon an equality, and prorating the pro-

ceeds derived from the sale of the property between the McClure estate and the Kings according to the amount of their notes. From that judgment this appeal is prosecuted.

We shall first examine the law applicable to cases of this character. In 1 Brandt on Suretyship & Guaranty (3d Ed.) p. 649, we find the following: "As a general rule, subrogation cannot be enforced until the whole debt is paid to the creditor. Part may be paid by the principal and part by the surety, and the surety then be entitled to subrogation, but the entire debt must be extinguished before subrogation can take place. It would not subserve the ends of justice to consider the assignment of an entire debt to a surety as effected by operation of law, where he had paid but a part of it, and still owed a balance to the creditor, and a court of chancery would not countenance such an anomaly as a pro tanto assignment, the effects of which would only be to give distinct interests in the same debt to both creditor and surety. Until the creditor is fully satisfied, there cannot usually be any interference with his rights or his securities which might even by bare possibility prejudice or embarrass him in any way in the collection of the residue of his claim." In 27 American & English Encyclopedia of Law (2d Ed.) p. 211, the rule is thus stated: "The creditor is entitled to full satisfaction of the debt before the right of subrogation may be invoked. The surety may not meddle with any of his rights and securities so long as any portion of the debt remains unsatisfied. As against the rights of the creditor, payment of a part of the debt by the surety will not subrogate him to a proportionate part of the securities applicable to the debt. Where a mortgage is given to secure sev-

eral notes, the surety is not entitled to subrogation until all the notes are paid.'' In Columbia Finance & Trust Co. v. Kentucky Union Railway Company, 60 Fed. 794, 9 C. C. A. 264, the court in passing on this question said: ''The rights of the creditor in the mortgaged property had not been extinguished by a payment of the whole debt. The payment of the whole debt for which the surety is liable is essential to subrogation. If the surety upon making a partial payment became entitled to subrogation pro tanto, and thereby became entitled to the position of an assignee of the property to the extent of such payment, it would operate to place such surety upon a footing of equality with the holders of the unpaid part of the debt, and, in case the property was insufficient to pay the remainder of the debt for which the guarantor was bound, the loss would logically fall proportionately upon the creditor and upon the surety. Such a result would be grossly inequitable. Yet this is in effect the result of the contention urged. The equity of subrogation does not arise from the mere obligation to pay. It springs alone from payment. The liability of the surety for the remainder of the debt continued as well after as before such payment, and, until the entire debt is paid, the surety has no such equity as will entitle him to the active aid of a court of equity.'' The court further said: ''The creditor's rights in the mortgage must be entirely divested before the surety can be substituted by operation of law, and allowed to stand in the shoes of a creditor.'' The foregoing doctrine was recognized and applied by this court in the case of Willingham v. Ohio Banking & Trust Company, 56 S. W. 706, 57 S. W. 467, 22 Ky. Law Rep. 158. This was a case where the principal debtor owed the trust

company various debts, upon one of which amounting to the sum of $450 Willingham was surety. The principal debtor transferred to the company certain insurance policies as collateral security on his entire indebtedness. Willingham paid the debt for which he was surety. The trust company surrendered the two policies, and received thereon the sum of $750. Willingham sued for a pro rata distribution of said sum. The court held that no cause of action arose in his favor until all the debts held by the trust company were fully paid.

Applying these principles to the case at bar, it is manifest that the surety, Frisbie, would not be entitled to subrogation as against Mrs. McClure on the two notes paid by him. To hold otherwise would permit Frisbie to recover from Mrs. McClure money to which she was, justly entitled and for which he was legally bound, for the proceeds of the property were not sufficient to pay all the lien debts. That being the case, it follows that appellees who obtained the notes in question by assignment from Frisbie stand in his shoes, and have no rights other than those that Frisbie could assert, unless it appear from the record that appellees' plea of estoppel is available against appellant. An examination of the record shows that appellee H. A. King testified in part as follows: "Q. Now, if you had any conversation with A. L. Frisbie, F. H. Martin, or H. D. McClure before you bought the notes, about the purchase of these notes, give the conversation with each in detail. A. The conversation between A. L. Frisbie and myself was that he owned the notes, and that he said they were the first notes on the property. I saw Mr. McClure and he said they were regular and all right. Mr. Martin told me they were the first

notes on the property, and he further stated that he expected to pay them off as they fell due. Q. At the time you spoke to H. D. McClure about your thinking of purchasing these notes, was anything said about the order in which these notes should be paid, and the notes then held by his mother, Mary H. McClure? A. I do not remember that there was. Q. To refresh your recollection, did he not tell you that it would be all right for you to purchase these notes, and that, if you purchased them, that they should be paid first, before the notes held by his mother? A. Yes; that was my understanding. Q. Now, just tell what he said about that. A. He said the notes were all right, and to go ahead and trade for them. That is about all I can state about it. Q. Did you tell Mr. McClure at the time that you were thinking of purchasing these notes? A. Yes, sir. Q. What did he say when you told him that? A. I think he said he had no objections; that it was all right." Mr. H. D. McClure, who is shown to be the agent of his mother, Mary H. McClure, testified as follows: "Q. Tell what, if any, arrangement was made between Mrs. McClure or you for her with him, as to how the said notes owing by Martin for the land were to be paid. I mean the notes held by you and the notes held by King. A. There was no arrangement made whatever. She expected to get the purchase money. Q. State whether or not there was any agreement made by her, or you for her, whereby the notes held by King were to be paid first. A. None whatever, except this: If Martin were to pay the King notes then and there, it would be all right with her, but no future payment would be. Q. Was any understanding or agreement had whereby King was to have a priority of lien on the land over the

notes held by Mrs. McClure? A. None whatever.'' It appears from the foregoing evidence that appellees relied more upon the statements made by Frisbie and Martin that the notes in question were the first notes on the property than they did upon the statements made by H. D. McClure. But it will not be contended that their statements could in any way bind Mrs. McClure, for they bore no such relation to Mrs. McClure as would authorize them to contract for her or say things that could be pleaded against her by way of estoppel. That being the case, the plea of estoppel must be supported alone by such agreeents or statements as were made by H. D. McClure on behalf of his mother. It nowhere appears in the record of the evidence that Frisbie's and Martin's statements that the notes purchased by appellees were the first notes on the property were ever repeated to H. D. McClure, and that he made his statements after knowing of the representations made by them. It only appears that he knew appellees were thinking of purchasing the notes, and what he said must be weighed and considered in the light of that knowledge alone. Appellee, when asked the direct question if anything was said about the order in which the notes should be paid, replied that he did not remember that there was. It was only when his recollection was refreshed by a very suggestive question of counsel that he claimed that it was his understanding that the notes he had purchased were to be paid first. When asked to tell exactly what was said about that by H. D. McClure, his reply, was: ''He said that the notes were all right, and to go ahead and trade for them.'' At another time, when asked what Mr. H. D. McClure said, his answer was: ''I think he said that he had no objections; that it

was all right." At still another time, his reply to the question, "Did you ask him (McClure) about the order in which the notes would be paid, if you should purchase them?" was, "I don't think that I did." Thus it will be seen that appellee H. A. King corroborates the testimony of H. D. McClure, who testified that there was no understanding nor agreement whereby King was to have a priority of lien over the notes held by his mother. As the question of the priority of the notes was not mentioned in the conversation between King and McClure, we must determine whether or not Mrs. McClure is estopped to assert the priority of her lien by the mere statement of her agent that the notes were all right. The rule is that, in order to work estoppel, the representations relied upon should be plain and positive, and such as would mislead a person of ordinary prudence. It is not sufficient that a party was misled by drawing an inference that was not warranted by the words used. The expressions used by H. D. McClure cannot be interpreted as carrying with them any waiver of the rights of his mother. If appellees were misled thereby, it was only because they attributed to his words a meaning which the words themselves did not reasonably import. Under the circumstances, therefore, Mrs. McClure's executor is not precluded from asserting the priority of his mother's lien.

Judgment reversed, with directions to the trial court to apply the proceeds of the sale of the property first to the payment of appellant's lien.